## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**TODD JOHNSON,**

   **Plaintiff,**

   **v.**

**UNIFIED SCHOOL DISTRICT NO. 500,
WYANDOTTE COUNTY, KANSAS,**

   **Defendant.**

**Case No. 16-CV-02578-JAR**

## MEMORANDUM AND ORDER

Plaintiff Todd Johnson brings this action against Defendant Unified School District 500 alleging claims of disability discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* Plaintiff, a former employee of Defendant, claims that Defendant discriminated against him on the basis of his disability when it did not re-hire him for any one of numerous positions for which he applied. Plaintiff also alleges that Defendant discriminated against him by deciding to cease considering him for any future employment whatsoever. This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. 43) and Plaintiff's Motion to Strike the Affidavits of Susan Westfahl, Leala Taylor, Phyllis Olbert and Jewell Ragsdale, Which Were Submitted in Connection with Defendant's Motion for Summary Judgment (Doc. 47). The motions are fully briefed and the Court is prepared to rule. For the reasons stated in detail below, Plaintiff's motion to strike is granted in part and found as moot in part, and Defendant's motion for summary judgment is granted.

## I.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[1] In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2]  "There is no genuine [dispute] of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party."[3]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4]  A dispute of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[5]

The moving party initially must show the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law.[6]  In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial need not negate the nonmovant's claim; rather, the movant need simply point out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim.[7]

---

[1] Fed. R. Civ. P. 56(a).

[2] *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010) (citing *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1210 (10th Cir. 2008)).

[3] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986)).

[4] *Wright ex rel. Tr. Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[5] *Adler,* 144 F.3d at 670 (citing *Anderson,* 477 U.S. at 248).

[6] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002), *cert. denied* 537 U.S. 816 (2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[7] *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

Once the movant has met the initial burden of showing the absence of a genuine dispute of material fact, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[8]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[9]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[10]  In setting forth these specific facts, the nonmovant must identify the facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[11]  To successfully oppose summary judgment, the nonmovant must bring forward "more than a mere scintilla of evidence" in support of his position.[12]  A nonmovant "cannot create a genuine issue of material fact with unsupported, conclusory allegations."[13]  Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[14]

## II.    Plaintiff's Motion to Strike the Affidavits of Susan Westfahl, Leala Taylor, Phyllis Olbert, and Jewell Ragsdale

Before considering the uncontroverted facts in this case, the Court must address Plaintiff's motion to strike the affidavits of Susan Westfahl, Leala Taylor, Phyllis Olbert, and Jewell Ragsdale, which Defendant has submitted in support of its summary judgment arguments.

---

[8] *Anderson,* 477 U.S. at 256; *Celotex,* 477 U.S. at 324; *Spaulding,* 279 F.3d at 904 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

[9] *Anderson,* 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir. 2001).

[10] *Mitchell v. City of Moore, Okla.,* 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler,* 144 F.3d at 670–71); *see Kannady,* 590 F.3d at 1169.

[11] *Adler*, 144 F.3d at 671.

[12] *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1539 (10th Cir. 1993).

[13] *Tapia v. City of Albuquerque,* 170 F. App'x 529, 533 (10th Cir. 2006) (citing *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004)).

[14] *Celotex,* 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

Plaintiff moves to strike the affidavits pursuant to Fed. R. Civ. P. 37(c)(1) because Defendant

never previously disclosed these affiants as witnesses as required by Fed. R. Civ. P. 26 and the

Court's scheduling order.  All four affiants were at all relevant times—and remain today—

Defendant's employees.  Specifically, Ms. Westfahl is Clerk for Defendant's Board of

Education, Ms. Taylor is the Principal of Douglass Elementary School, Ms. Olbert is the Office

Manager for Sumner Academy of Arts & Science, and Ms. Ragsdale is the Principal of

Coronado Middle School.

On February 15, 2017, Defendant served upon Plaintiff its initial Rule 26 disclosures.[15]

Although Defendant's initial disclosures included eight individually-named witnesses, seven of

whom are Defendant's employees, it did not include the four witnesses at issue in Plaintiff's

motion to strike.  On February 23, 2017, Magistrate Judge Gerald L. Rushfelt issued the

scheduling order for this case.[16]  That order provides:

> . . . In addition to other sanctions that may be applicable, **a party
> who without substantial justification fails to disclose
> information required by Fed. R. Civ. P. 26(a) or Fed. R. Civ. P.
> 26(e)(1) is not, unless such failure is harmless, permitted to use
> evidence at trial, at a hearing, or on a motion any witness or
> information not so disclosed**.  See Fed. R. Civ. P. 37(c)(1).
>
> Supplementation of those disclosures under Fed. R. Civ. P. 26(e)
> must be served throughout the case at such time and under such
> circumstances as required by that rule.   In addition, final
> supplemental disclosures must be served in any event 40 days before
> the deadline for completion of all discovery.   **The supplemental
> disclosures served 40 days before the deadline for completion of
> all discovery must identify all witnesses and exhibits that
> probably or even might be used at trial.  The opposing party and
> counsel should be placed in a realistic position to make
> judgments about whether to take a particular deposition of**

---

[15] Doc. 6 (Notice of Service); Doc. 47-1.

[16] Doc. 8.

> **pursue follow-up "written" discovery before the time allowed
> for discovery expires**. . . .[17]

The scheduling order set a deadline of September 1, 2017 for the completion of all discovery.[18]

Thus, the parties were to provide final supplementation of their Rule 26 disclosures 40 days prior

to that date, or by August 8, 2017.  Defendant supplemented its disclosures on July 21, 2017 with

the names of four additional current and former employees.[19]  However, Defendant's supplemental

disclosures did not include the names of the four witnesses whose affidavits Plaintiff moves to

strike.

Under Fed. R. Civ. P. 37(c)(1), when a party fails to designate a witness as required by

Fed. R. Civ. P. 26(a),

> the party is not allowed to use that information or witness to supply
> evidence on a motion, at a hearing, or at a trial, unless the failure
> was substantially justified or is harmless.  In addition to or instead
> of this sanction, the court, on motion and after giving an opportunity
> to be heard:
> (A) may order payment of the reasonable expenses, including
> attorney's fees, caused by the failure;
> (B) may inform the jury of the party's failure; and
> (C) may impose other appropriate sanctions, including any of the
> orders listed in Rule 37(b)(2)(A)(i)-(vi).[20]

A district court has discretion in deciding whether a Rule 26 violation is harmless or

substantially justified.[21]  In so deciding, the Court looks to several factors: "(1) the prejudice or

surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the

---

[17] *Id.* at 4.

[18] *Id.* at 2.

[19] Doc. 28 (Notice of Service); Doc. 47-2.

[20] Fed. R. Civ. P. 37(c)(1).

[21] *Guang Dong Light Headgear Factory Co., Ltd. v. ACI Int'l, Inc.*, No. 03-4165-JAR, 2008 WL 53665, at *1 (D. Kan. Jan. 2, 2008) ("Whether a violation of Rule 26(a) is 'substantially justified' or 'harmless' is left to the broad discretion of the Court.") (citing *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 953 (10th Cir. 2002)).

prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness."[22]  The burden to demonstrate that the failure to disclose is harmless or substantially justified is on the party who failed to properly disclose.[23]

Plaintiff argues that the affidavits of Ms. Westfahl, Ms. Taylor, Ms. Olbert, and Ms. Ragsdale should be stricken because these individuals were never previously identified as witnesses and their affidavits are now being offered to deny or rebut Plaintiff's claim of disability discrimination.  Specifically, Ms. Westfahl's affidavit describes the role of Defendant's Human Resources Department in the hiring of job applicants and sets forth the number of applicants for various positions for which Plaintiff applied but was not hired.[24]  The remaining three affidavits discuss the qualifications of the individuals who were ultimately hired for the positions of Principal's Secretary at Douglass Elementary School (Taylor Affidavit),[25] High School Athletics Secretary/Principal's Secretary at Sumner Academy of Arts & Science (Olbert Affidavit),[26] and Principal's Secretary/Treasurer at Coronado Middle School (Ragsdale Affidavit).[27]  Plaintiff points out that the information set forth in the affidavits was known to Defendant well before the close of discovery, as was the identity of the four affiants, who are all Defendant's employees.  Plaintiff argues that Defendant has no valid justification for its failure to disclose these affiants, and that Plaintiff will be prejudiced if the Court considers their affidavits because Plaintiff had no opportunity to discover information about their testimony,

---

[22] *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1130 (10th Cir. 2011) (quoting *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999)).

[23] *Paliwoda v. Showman*, No. 12-2740-KGS, 2014 WL 3925508, at *5 (D. Kan. Aug. 12, 2014) (citing *A.H. v. Knowledge Learning Corp.*, No. 09-2517-DJW, 2010 WL 4272844, at *5 (D. Kan. Oct. 25, 2010)).

[24] Doc. 47-3.

[25] Doc. 47-4.

[26] Doc. 47-5.

[27] Doc. 47-6.

through taking their depositions or otherwise.  Plaintiff argues that curing such prejudice would require reopening discovery and that additional briefing on dispositive motions may be necessary.

Defendant makes a variety of arguments in opposition to Plaintiff's motion to strike. With respect to Ms. Westfahl, Defendant argues that she "falls under a category of witness that was identified,"[28] namely witnesses needed to lay the foundation for the admission of exhibits.[29] Defendant also argues that Ms. Westfahl's affidavit was submitted in lieu of that of Dr. Kelli Mather, who was included in Defendant's supplemental disclosures but was sick at the time Defendant's summary judgment motion was due and therefore unable to sign an affidavit.  Dr. Mather is, and was at all relevant times, Defendant's Chief Operations Officer and was deposed during discovery.  Defendant states that as the records custodian for the Board of Education, Ms. Westfahl "was the only individual with the care and custody of the records of the Defendant such that she could attest to the same facts to which Dr. Mather would have in her affidavit."[30] Defendant further argues that it should be permitted to substitute the affidavit of Dr. Mather[31]— which has since been executed—for that of Ms. Westfahl, as the two affidavits are not materially different and substitution would "not result in any additional facts or evidence which would require further response from Plaintiff."[32]

The Court finds as moot Plaintiff's motion to strike with respect to the affidavit of Ms. Westfahl and grants Defendant's request for leave to substitute Dr. Mather's affidavit for that of

---

[28] Doc. 51 at 1.

[29] Doc. 47-1 at 4, ¶ 11.

[30] Doc. 51 at 5.

[31] Doc. 51-2.

[32] Doc. 51 at 7.

Ms. Westfahl.  Although Defendant should have been better prepared to file its summary judgment motion and properly executed supporting affidavits on the date they were due—particularly given that it requested and received three extensions of time[33]—the Court finds no prejudice to Plaintiff in allowing the substitution.  Dr. Mather was included in Defendant's supplemental Rule 26 disclosures, Plaintiff has taken her deposition, and her affidavit is not materially different from that of Ms. Westfahl.  Thus, the Court will not forbid Defendant the ability to rely upon Dr. Mather's affidavit because she was ill and unable to sign it at the time Defendant's summary judgment motion was due to be filed.

With respect to the remaining three affidavits, Defendant argues that the Court should deny Plaintiff's motion to strike because its omission of Ms. Taylor, Ms. Olbert, and Ms. Ragsdale from its Rule 26 disclosures was both substantially justified and harmless.  As set forth above, these affidavits discuss the qualifications of candidates who were hired instead of Plaintiff for certain positions.  Defendant argues that the applications of the successful candidates have been produced in discovery and, therefore, "Plaintiff has had every opportunity to explore and discover the qualifications of th[ose] candidate[s] and the process that led to selection through discovery."[34]  Defendant further argues that these affidavits do not challenge any of Plaintiff's proffered qualifications, that they contain facts presented elsewhere in the record, and that the failure to timely identify the affiants was an oversight.[35]  Defendant also offers to produce these affiants for their depositions to cure any possible prejudice to Plaintiff, and submits that reopening discovery to do so would not delay or otherwise impact the trial.[36]

---

[33] Docs. 37, 40, 42.

[34] Doc. 51 at 9, 11, 13.

[35] *Id*. at 7–14.

[36] *Id*. at 7.

Finally, with regard to Ms. Olbert and Ms. Ragsdale, Defendant argues that it was not under any obligation to identify these witnesses because their affidavits concern positions (*i.e.*, Athletics Secretary/Assistant Principal's Secretary and Principal's Secretary/Treasurer) that Plaintiff failed to identify in his Complaint or discovery responses as underlying his discrimination claim. Defendant states that "Plaintiff is clearly not pursuing claims based on these two positions for which he applied but was not hired. Accordingly, Defendant was not under any obligation pursuant to Fed. R. Civ. P. 26 to identify witnesses concerning these two positions."[37]

The Court finds Defendant's argument that it was not required to identify Ms. Olbert and Ms. Ragsdale unpersuasive, given that Defendant now offers these witnesses to defeat claims that it is simultaneously contending Plaintiff is not raising. Plaintiff was questioned at his deposition regarding the positions discussed in these affidavits,[38] and the parties stipulated in their October 2017 pretrial order that Plaintiff applied for these positions.[39] Thus, Defendant cannot reasonably contend not to have known that the job openings discussed by Ms. Olbert and Ms. Ragsdale were at issue in this case substantially in advance of submitting its motion for summary judgment in December 2017.

Defendant is offering the affidavits of Ms. Taylor, Ms. Olbert, and Ms. Ragsdale—who are employed by Defendant and whose identities were known to Defendant prior to the close of discovery—to deny or rebut Plaintiff's allegation of disability discrimination by showing that certain positions to which he applied were filled by better-qualified candidates. Therefore, Defendant should have timely disclosed these witnesses pursuant to Rule 26, and the Court finds

---

[37] *Id*. at 3.

[38] Deposition of Todd Johnson, Doc. 46-1 at 135:12–147:1.

[39] Doc. 38 at 8, ¶¶ 49–50.

that Defendant's failure to do so is prejudicial to Plaintiff.  Plaintiff had no knowledge of these witnesses or opportunity to depose them prior to the filing of Defendant's summary judgment motion.[40]  Defendant's argument that Plaintiff did not need to know the identity of these witnesses because the evidence they offer was available elsewhere in the record is unavailing; Plaintiff was entitled to the opportunity to depose witnesses whose statements would be used in support of summary judgment against him.

Further, the Court disagrees with Defendant that reopening discovery would not prejudice Plaintiff or delay the trial date for this matter, which is a mere two months away and which has already been continued once due to the parties' repeated requests for extensions of time to complete summary judgment briefing.  Another round of briefing following additional discovery certainly would have delayed the trial of this case.[41]  Defendant has failed to make a showing that its failure to disclose Ms. Taylor, Ms. Olbert, and Ms. Ragsdale was substantially justified or harmless, and Plaintiff's motion to strike is granted as to these witnesses' affidavits.

## III.   Uncontroverted Facts

As an initial matter, the parties have made the process of determining the uncontroverted facts in this case unnecessarily difficult for the Court.  D. Kan. Rule 56(b)(1) provides that "[a] memorandum in opposition to a motion for summary judgment must begin with a section

---

[40] *See Univ. of Kan. v. Sinks*, 565 F. Supp. 2d 1216, 1229 (D. Kan. 2008) (striking declarations of witnesses who were not disclosed prior to filing of summary judgment motion because "[a]llowing this new evidence at the summary judgment stage will prejudice defendants.  They had no notice of these witnesses until the summary judgment motion was filed. . . .  Allowing defendants the opportunity to cure this prejudice would require reopening discovery and probably postponing the trial."); *Clean Harbors, Inc. v. CBS Corp.*, 875 F. Supp. 2d 1311, 1316 (D. Kan. 2012) (striking affidavit submitted in opposition to summary judgment where affiant had not been previously disclosed and allowing evidence would prejudice defendant because it had no notice that plaintiff was relying on witness and no opportunity to depose witness).

[41] As explained below in Section IV.B., the exclusion of the Taylor, Olbert, and Ragsdale affidavits ultimately does not dictate the outcome of this case.  Because the Court grants summary judgment, there will be no trial in this matter.

containing a concise statement of material facts as to which the party contends a genuine issue

exists.  Each fact in dispute must . . . refer with particularity to those portions of the record upon

which the opposing party relies. . . ."  In his response brief, Plaintiff states that many of

Defendant's facts are "undisputed but immaterial," and then proceeds to qualify his response

with other facts and with arguments of counsel.  Plaintiff then sets forth his own additional facts

pursuant to D. Kan. Rule 56(b)(2).  In its reply, Defendant also qualifies many of its responses to

Plaintiff's statements of fact.  Rather than stating that the fact is controverted and citing to those

portions of the record on which it relies as required by D. Kan. Rule 56(c), Defendant often

objects to Plaintiff's attempt to "color the testimony" and argues that the facts alleged are

unsupported and should be disregarded, sometimes for overly technical reasons.

These tactics on both sides are improper and have resulted in many pages of unnecessary

briefing by the parties, much additional time and effort expended by the Court, and confusion for

all.  The Court has nonetheless attempted to cull the following stipulated or uncontroverted facts

from the Pretrial Order and the parties' voluminous briefing.  If controverted, the facts are

construed in the light most favorable to Plaintiff.[42]

Defendant is the unified school district for Kansas City, Kansas.  At all relevant times,

Shelly Beech was a Director of Human Resources ("HR") for Defendant, and Robert Wilcox,

Ph.D., was Defendant's Lead HR Director.  HR Directors are involved in several aspects of the

hiring process for positions within the district.  Specifically, they review materials sent by the

hiring manager for a particular position, conduct the initial screening of applications to make

sure that candidates hold any necessary certifications, and pass along to the building principal or

---

[42] Factual disputes about immaterial matters are not relevant to a summary judgment determination. Therefore, immaterial facts and factual averments not supported by the record are omitted.  *Frank v. U.S. W., Inc.*, 3 F.3d 1357, 1361 (10th Cir. 1993) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

administrator the materials of those applicants who possess the required qualifications.  The

building principal or administrator is part of an interview committee, which selects the

individuals to be interviewed.  When a candidate has been recommended for hire, the HR

Director confirms his or her references, pulls together a salary package, extends an employment

offer, and then works to bring the hired employee on board.  Defendant's HR Department and

Board of Education must give final approval for the hiring of each applicant.[43]  Similarly,

disciplinary actions, including the termination of an employee at the recommendation of his or

her supervisor, must receive final approval from the HR Department.[44]

In addition to their involvement in the hiring process, HR Directors deal with issues

related to harassment, discrimination, retaliation, and investigations into such matters.

Defendant maintains policies and procedures that prohibit discrimination in hiring based on

disability or perceived disability.  Specifically, Defendant's written policy states that

"[d]iscrimination against any individual on the basis of race, color, national origin, sex/gender . .

. disability, age, religion, or any other basis prohibited by law in the admission or access to, or

treatment or employment in the District's programs and activities is prohibited."[45]  Defendant's

policy further provides that disability harassment includes conduct that has the effect of

interfering with an individual's work performance or employment opportunities, and that such

harassment is not to be tolerated in the school district.[46]

Complaints of discrimination are to be promptly investigated in a thorough and complete

manner and resolved using Defendant's discrimination complaint procedures.  Defendant's

---

[43] Deposition of Shelly Beech, Doc. 46-3 at 53:4–12.

[44] Deposition of Robert Wilcox, Doc. 46-2 at 37:23–38:19.

[45] Doc. 46-5 at 2.

[46] Doc. 46-6 at 2–3.

policy states that "[a]ny incident of discrimination in any form shall promptly be reported to an employee's supervisor, the building principal or the district compliance coordinator for investigation."[47]  Complaints of discrimination can also be made to an individual in the HR Department.  Defendant's policy provides for the resolution of complaints through both formal and informal procedures.[48]

Plaintiff Todd Johnson received a bachelor of science degree from Arkansas Tech University in 2010.  While in college, he was a student assistant to the basketball team for the 2009-2010 season.  Upon graduating, he worked as an assistant basketball coach and residential dorm director at East Central Community College in Decatur, Mississippi from June 2010 to December 2012.  On October 21, 2013, Plaintiff was hired by Defendant as an ISS Monitor at J.C. Harmon High School.  That position required Plaintiff to monitor students during in-school suspension, assist students with homework, diffuse potentially aggressive situations, provide security in the cafeteria, and communicate with security personnel and parents.  Plaintiff's fluency in Spanish allowed him to communicate with parents of students at J.C. Harmon, where nearly 70 percent of the student body speaks Spanish.  Plaintiff also served as an assistant high school basketball coach at Sumner Academy of Arts & Science for the 2013-2014 school year. Plaintiff does not have a valid Kansas teaching certificate, substitute teaching certificate, or Kansas State High School Activities Association Rule 10 Certification ("Rule 10 Certification"). However, Plaintiff believed that his NCAA certification through LexisNexis allowed him Rule 10 Certification.

---

[47] Doc. 46-5 at 2.

[48] Doc. 50-3 at 3.

In 2014, Plaintiff began experiencing cramping in his toes and feet that eventually led to swelling and difficulty walking. In May 2014, he was diagnosed with POEMS Syndrome, a form of multiple myeloma, and in April, began taking leave from work to deal with his medical issues. In the summer of 2014, Ms. Beech explained to Plaintiff that if he was not able to return to work after his leave had been exhausted, his employment could be terminated. Ms. Beech told Plaintiff that if he resigned but was able to return to work in the future, "he could apply for a job he was qualified for."[49] On August 8, 2014, Plaintiff voluntarily resigned his employment with Defendant. Plaintiff testified that although Ms. Beech did not guarantee that he would be selected for a position when he applied to be rehired, he believed—based on his conversations with her—that he would receive "priority treatment"[50] and that he would be "highly considered for the positions [he] was qualified for."[51]

In the fall of 2015, Plaintiff began communicating with Ms. Beech regarding his desire to be rehired by Defendant. On September 1, 2015, Plaintiff emailed Ms. Beech in follow up to a recent phone conversation, stating that per her request, he was communicating with her on jobs he felt he was qualified for.[52] Plaintiff ultimately applied for thirteen different positions with Defendant in the fall of 2015. Plaintiff submitted applications for five of those positions on September 1, 2015—Middle School Computer Applications Teacher, part-time Middle School Boys' Assistant Basketball Coach, Family Service Worker, High School Treasurer, and Truancy Program Specialist.

---

[49] Deposition of Shelly Beech, Doc. 46-3 at 58:10–11.

[50] Deposition of Todd Johnson, Doc. 46-1 at 196:23.

[51] *Id.* at 197:12–13.

[52] Doc. 46-21 at 2.

Defendant received thirty-seven applications for the position of Middle School Computer Applications Teacher, which required a valid Kansas teaching certificate.  Plaintiff did not possess a Kansas teaching certificate and, therefore, was not among the qualified applicants for this position.[53]  Moreover, this position was never filled due to budgetary constraints.  The position of part-time Middle School Boys' Assistant Basketball Coach—to which twenty-four people applied—also required either a Kansas teaching certificate or a Rule 10 Certification, neither of which Plaintiff possessed.  Thus, Plaintiff was not qualified for this coaching position.[54]  Further, Plaintiff sent an email to Ms. Beech on October 12, 2015 withdrawing his application for this position due to conflicts with his motivational-speaking schedule.[55]

Defendant received sixteen applications for the Family Service Worker position.  Defendant considered a background in social work to be a minimum qualification for this position, and Plaintiff has no such background.  In addition, Defendant filled this opening in August 2015, *before* Plaintiff submitted his application on September 1.[56]

Defendant received fifty-one applications for the position of High School Treasurer.  This position required a minimum of two years of experience in accounting or bookkeeping, but did not require an accounting degree.  Although Plaintiff testified to some accounting and bookkeeping experience from prior work in a non-school setting, his application did not specifically list that experience.[57]  Plaintiff's application did reference his experience handling budgeting and expenses during his time as a basketball coach.[58]  Plaintiff interviewed for the

---

[53] Pretrial Order, Doc. 38 at 5, ¶ 20.

[54] *Id*. at 5, ¶ 24.

[55] *Id*. at 5, ¶ 25.

[56] *Id*. at 6, ¶ 29.

[57] Doc. 46-25.

[58] *Id*. at 5.

High School Treasurer position, but was not selected. The individual chosen for the job was a college student working toward an accounting degree. Defendant judged that this individual's skills, personality, and positive and professional attitude would be a good fit for the position and the office environment.

Defendant received thirteen applications for the position of Truancy Program Specialist. Plaintiff interviewed for this position on October 15, 2015, but was not hired. The candidate who was hired for this position was already working for Defendant as a migrant data specialist, and had prior experience as an attendance secretary. Thus, this individual was familiar with Defendant's attendance process and how truancy is handled within the school district. The successful candidate was also familiar with student data programs, district operations, and Kansas truancy laws.

Plaintiff applied for three additional positions on September 21, 2015, including part-time Substitute Teacher, part-time Short-Term Suspension Monitor, and Parent Liaison/Recovery Room Teacher. The part-time Substitute Teacher position required a valid Kansas teaching certificate or a substitute teaching certificate. Defendant was aware that Plaintiff had neither, but nonetheless selected Plaintiff for an interview. Although Plaintiff sent Ms. Beech an email on September 22, 2015 reminding her that he was on a "disability ticket to work" program and asking whether he could begin substitute teaching immediately,[59] he never interviewed for this position. Rather, he sent Ms. Beech another email two days later, on September 24, asking for guidance on the hiring process and stating that he was no longer interested in substitute teaching.[60] Plaintiff informed Ms. Beech that he wanted to be considered instead for non-

---

[59] Doc. 46-7 at 5.

[60] Id. at 3–4.

certification jobs that aligned with his educational and professional experience.[61]  Non-certification jobs are those that do not require certification or licensure, such as certain coaching, custodial, secretarial, and paraprofessional positions.  Plaintiff later withdrew his application for the part-time Substitute Teacher position because it was not a full-time position.[62]  The Short-Term Suspension Monitor position was filled on September 16, 2015—six days *prior* to Plaintiff submitting his application.

The third position to which Plaintiff applied on September 21, 2015—Parent Liaison/Recovery Room Teacher—was a full-time job and required that candidates have or be able to obtain a Kansas Emergency Substitute Certificate.  Defendant received forty-two applications for this position, which shares at least some duties in common with the ISS Monitor position that Plaintiff previously held at J.C. Harmon High School.  Although Plaintiff did not have a Kansas Emergency Substitute Certificate at the time he applied, Ms. Beech referred his application to two school principals.  Plaintiff was never interviewed for this job opening.  The individual hired for the position was already employed by Defendant and her position was being eliminated as part of a reduction in force.

On September 28, 2015, Plaintiff applied for the position of Para Educator.  The person hired for this job would be assigned to work in a special-education classroom with emotionally disturbed students.  Plaintiff had no formalized training in working with special-education students and did not indicate any such experience on his resume.  Nonetheless, Ms. Beech sent an email to Defendant's Special Education Coordinator on September 28, 2015 asking her to send out Plaintiff's application and indicating that Plaintiff was "qualified, a former employee . .

---

[61] *Id.* at 3.

[62] Pretrial Order, Doc. 38 at 7, ¶ 39.

. returning to work.  References are good."[63]  Defendant received 151 applications for the Para Educator position, and although Plaintiff interviewed, he was not selected for the job.  The individual who Defendant hired for this position had previous employment experience providing care, supervision, and assistance to emotionally disturbed children in a group home.

Also on September 28, 2015, Plaintiff emailed Ms. Beech regarding his status as a disability hire.  That email states, in part:

> The Drs [sic] set me free today Ms. Beech.  Do you or would you like info on the federal Disability Ticket to work program.  It makes me a diversity hire and protects both myself and the district.  My story is not only inspiring to the staff, but I've been motivational speaking to youth as well recently.  I firmly believe my story and recovery can be a true asset to the di[s]trict. . . .[64]

Ms. Beech and Dr. Wilcox testified that they did not consider Plaintiff's email communications to Ms. Beech throughout September 2015 to be rude, disrespectful, or threatening.

On October 12, 2015, Plaintiff applied for a position as a Principal's Secretary.  Defendant received 172 applications for this job opening.  Plaintiff had never previously worked as a secretary in an elementary, middle, or high school, nor did his application reflect any prior experience as a secretary.  His resume did reflect that he had experience with certain administrative and organizational tasks from his time as an assistant college basketball coach.[65]  Plaintiff was not interviewed or hired for this position.

Also on October 12, 2015, Plaintiff sent Ms. Beech several emails expressing confusion and frustration about the fact that he had not yet been hired.  In the first email, Plaintiff indicated

---

[63] Deposition of Todd Johnson, Doc. 46-1 at 125:23–126:2.

[64] Doc. 46-8 at 1.

[65] Doc. 46-30 at 4–5.

that he had not heard back regarding the Treasurer and Truancy Program Specialist positions for

which he had interviewed, and further stated, in part:

> I'm really not understanding the timing of the positions I applied
> for. . . .
>
> I am extremely qualified [for] all of these positions and just confused
> why I can't get back into the district I resigned from in good faith,
> due to my disability.
>
> Please help me understand the process and timing, because in
> Oct[ober] of 2013 it took me 2 weeks to find a job in the district. . .
> .
>
> I'm confused and frustrated and certainly hope my agreement with
> you to resign in good faith so that I can return when able again is
> honored.[66]

Ms. Beech responded—in an email copying Dr. Wilcox—with some explanation about

the hiring process.  She stated that Plaintiff's application had been forwarded to the hiring

managers, that he would be "eligible for any position for which [he was] qualified," and that he

should "continue to apply for those positions [he was] interested in so that [he could be]

considered."[67]  Plaintiff responded in a second email stating, in part:

> I am highly qualified for all the positions I sent you.  Besides waiting
> on my new Esub certificate, [I] just can't see why I'm not hired yet.
>
> My resignation letter clearly stated I would be able to return in good
> faith once able.  Your other statement to me at the time was you
> would have had to terminate me, which [I] then replied [I] would
> resign in good faith.  That was our conversation.
>
> I would just like the district to stand behind their word!  Not trying
> to be difficult, but I am seriously confused I haven't received more
> interviews or offers.
>
> I'd be happy to meet face to face to discuss![68]

---

[66] Doc. 46-10 at 2–3.

[67] *Id*. at 2.

[68] Doc. 46-11 at 2.

Again, Ms. Beech responded with information about the hiring process. She explained:

> You are correct that you were going to be terminated because you had no more days left for leave. We had exhausted all available leave for you. I did state that you would be in good standing and would be able to apply for any position for which you are qualified once you were able to return to work. You did resign so you do have to go through the application and hiring process to come back into the district. We have large numbers of applicants apply for our positions. There is no guarantee that you will receive an interview and/or be selected for a position. As I stated earlier, this is a decision made by the hiring manager.
>
> You have stated that you want us to stand behind our word. I believe we are doing that by sending out your application to hiring managers for their consideration. If there is more you feel we should be doing related to this statement, please let me know.[69]

Ms. Beech also explained in a separate email that Plaintiff would need to submit a full application, rather than the internal application intended for use by current employees, "to allow[] for the hiring manager to see more information initially about [him] as the applicant."[70] Plaintiff responded by reiterating his request for an in-person meeting.[71]

In another email to Ms. Beech on the same date, Plaintiff followed-up on an earlier communication in which he had included information on the tax benefits of employing disabled workers. That email stated:

> Is this not important to the district? A diversity hire? Disability ticket to work?
>
> I thought this would be a positive stance for the District. Publicly especially with my #NoZer0days motivational speaking, father figure not for profit organization and the fact that the entire community is supporting me.

---

[69] *Id.*

[70] Doc. 46-12 at 5.

[71] *Id.*

I'm asking for help and support from the district now![72]

While Ms. Beech acknowledged during her deposition that Plaintiff did not curse at her or threaten her with physical harm in his October 12, 2015 emails, she also testified that in her opinion, the content of Plaintiff's emails revealed that he was becoming "increasingly agitated," and that when a job applicant becomes agitated, it can be a problem for the school district because it does not "know what to expect from [the applicant]."[73] Dr. Wilcox testified that he had "a level of concern" about these emails because Plaintiff seemed to be placing pressure on Ms. Beech to hire him.[74] Dr. Wilcox further testified that Defendant's HR personnel "want to be very cautious because we understand individuals can get upset during the hiring process,"[75] and that HR tries to "make sure that [it] maintain[s] a safe standard for everyone that we work with"[76] because "[w]e never know what an individual might do."[77]

On October 14, 2015, Plaintiff informed Ms. Beech by email that he was withdrawing his application for the part-time Substitute Teacher position and that he was only interested in full-time positions.[78] On the same date, Plaintiff applied for the position of Athletic Secretary/Assistant Principal. Defendant received 101 applications in response to this job posting. Although Plaintiff had experience monitoring student athletes' eligibility from his time as an assistant basketball coach at Sumner Academy of Arts & Science, he had no prior

---

[72] Doc. 46-13 at 2.

[73] Deposition of Shelly Beech, Doc. 46-3 at 109:4–110:18.

[74] Deposition of Robert Wilcox, Doc. 46-2 at 110:25–112:7.

[75] *Id*. at 119:14–16.

[76] *Id*. at 119:19–20.

[77] *Id*. at 119:22.

[78] Pretrial Order, Doc. 38 at 7, ¶¶ 39, 42.

experience communicating directly with the Kansas State High School Activities Association. Plaintiff's only familiarity with the school district's student database program was from his time as an ISS Monitor, when he was required to look up students' files so that he could contact their parents. Plaintiff did not receive an interview or a job offer for this position.

Also on October 14, 2015, Ms. Beech met with Plaintiff pursuant to his prior request for a face-to-face meeting. During that meeting, Plaintiff wore an arm brace and used a cane or crutch to walk. Plaintiff testified that he discussed with Ms. Beech the positions to which he had applied, whether he had received interviews, and the difference between internal and external applications.[79] Plaintiff did not curse at or threaten Ms. Beech during their meeting. However, Ms. Beech told Dr. Wilcox that Plaintiff was "upset because he's not getting placed in a job,"[80] and that the meeting was "difficult."[81]

Following the meeting, Ms. Beech sent Plaintiff an email in which she stated, in part:

> You shared with me in the meeting that you felt you should be hired back into the district since you resigned in good faith. You indicated that you thought since you had resigned rather than be terminated that you should be placed in a position without the normal hiring process. As I explained to you yesterday and previously in an email, when you resigned I would have explained to you that you would be in good standing and could re-apply when you were able to return to work. It would not have been my practice or the practice of Human Resources to tell you that you would be automatically placed in a position when you were able to return.
>
> We will continue to screen and send your application to hiring managers for those positions for which you are qualified. . . . .[82]

---

[79] Deposition of Todd Johnson, Doc. 46-1 at 223:22–224:18.

[80] Deposition of Shelly Beech, Doc. 46-3 at 125:24–25.

[81] *Id.* at 125:21.

[82] Doc. 46-14 at 2.

Plaintiff replied to Ms. Beech's email, copying Dr. Wilcox, as follows:

> "It would not have been my practice or the practice of Human Resources to tell you that you would be automatically placed in a position when you were able to return."

> I never said to place me, but that I should be highly recommended from the district administration. You are not quoting me properly.[83]

Ms. Beech testified that Mr. Johnson did not curse at her in this email and that she did not view his response as belligerent behavior. Dr. Wilcox testified while he did not believe Plaintiff was threatening Ms. Beech, Plaintiff's tenor was "challenging"[84] and that Plaintiff seemed to be in "a very agitated state."[85]

On October 19, 2015, Plaintiff sent another email to Ms. Beech and copied Dr. Wilcox. In that email, which followed up on a discussion Plaintiff and Ms. Beech had been having concerning Plaintiff's interview for the Truancy Monitor position, Plaintiff stated, in part:

> Like I stated before . . . I have many other applications in the system I am certainly qualified for if not over qualified and nor [sic] getting interviews. I stated this to you in person and will state this to Dr. Wilcox as he is being carbon copied. "This can be a positive for USD500 or a negative." That said the ball is in the districts [sic] court. I've battled insurance companies, the state of Kansas, cancer and a disability and I've won. . . .

> Now per the ADA, I feel as if I'm being passed over for positions based of [sic] my disabled state. Again, we can make this easy or hard. I will let the district decide.

> Dr. Wilcox, I think it might be a good idea if I sit down with you face to face as my meeting with Ms. Beech did not have a resolution. . . . . If we need to involve Mr. Smith from the PR department I'd suggest he be involved as well.

---

[83] *Id.*

[84] Deposition of Robert Wilcox, Doc. 46-2 at 135:3.

[85] *Id.* at 135:15.

> That is my stance.  Please let me know when we can arrange this meeting.  Myself and my many political and professional contacts are awaiting the outcome of your decision.[86]

Ms. Beech testified that she viewed Plaintiff's October 19, 2015 email as a threat that he would go to the news media or his political and professional contacts in the community if Defendant did not do as he wanted.  In fact, Plaintiff did leave a voicemail for David Smith, Defendant's Communications Director, but never spoke with him.  Ms. Beech did not interpret Plaintiff's October 19 email as a threat of physical harm.

When Dr. Wilcox responded to Plaintiff's email on October 20, 2015 by asking what additional questions he could answer,[87] Plaintiff replied by reiterating his desire for an in-person meeting with Dr. Wilcox and expressing his frustration with not having been hired.  That email reads, in part:

> We need to meet.  You need to make time.  I'm not meeting with Shelly Beech ever again.  We need a face to face or I need one with her direct supervisor.
>
> My questions and issues will be discussed in person.  I resigned "in good faith" Bob.  I'm being passed over for jobs I'm highly qualified for, I'm not even getting interviews on some.  I'm very upset with the district and you can make this easy or hard.  [I've] already contacted David Smith, I have board members that are friends if [sic] mine concerned of your hiring process and the districts [sic] direct approach to my "trying" to return to the district that I was highly regarded in before my health issues.
>
> Needless to say, we need a sit down![88]

---

[86] Doc. 46-15 at 3.

[87] *Id.* at 2.

[88] *Id.*

Dr. Wilcox testified that, as a human resources employee with twenty-two years of experience working with many types of individuals and personalities, he is good at reading people and interprets a statement such as "you can make this easy or hard" to be a threatening statement.[89]

Approximately forty minutes after receiving the foregoing message from Plaintiff, Dr. Wilcox sent an email to his assistant, Lisa Wilson—copying Dr. Kelli Mather, Defendant's Chief Operations Officer—asking that Ms. Wilson have front-desk security "flag" Plaintiff. Dr. Wilcox stated:

> Please contact the front security desks to flag former employee Todd Johnson. I am concerned that he might try to enter the building without an appointment. If he has an appointment and this can be confirmed, he may proceed. However, we are requesting that security calls up to the person he says he is visiting and it's then confirmed by the person he is requesting to see.[90]

Dr. Wilcox testified that applicants who begin to challenge why they have not been hired raise his level of concern as a Human Resources employee, and that it is the responsibility of the Human Resources Department to maintain a safe environment for the persons they work with. Ms. Beech testified that although she has never personally done so, Human Resources directors may flag an individual with security when that person is of concern or may enter the building and cause a disruption. Plaintiff never expressly stated his intent to enter Defendant's offices without a prior appointment. Dr. Wilcox testified that he does not recall how many times in the past he has flagged a former employee to prevent that person from entering the building without an appointment, nor does he recall the identity of any individual he has flagged other than Plaintiff.

---

[89] Deposition of Robert Wilcox, Doc. 46-2 at 156:21–157:7.

[90] Doc. 46-16 at 2.

Dr. Mather testified that she recalled one brief conversation with Dr. Wilcox about Plaintiff, during which Dr. Wilcox expressed concern about having to meet with Plaintiff and requested that Dr. Mather participate in that meeting.  Dr. Mather did not personally review prior correspondence between Plaintiff, Dr. Wilcox, and Ms. Beech.  She did agree to participate in the meeting, which was scheduled for October 26, 2015.  On October 22, 2015, Dr. Wilcox sent an email to Dr. Mather explaining certain precautions to be taken for that meeting:

> I am going to have Lisa schedule the meeting with Mr. Johnson by one of the conference rooms near an exit.  Mr. Johnson was pretty aggressive with her on the phone as he insisted on the meeting to be scheduled for an hour+.  He went so far as to say to Lisa that he is giving me the "directive to call him and explain why he cannot meet for longer than an hour."
>
> We will also have Security lined up to be in the general area in case Mr. Johnson displays this type of behavior during the meeting.[91]

Although Plaintiff never made an express, physical threat toward either Ms. Beech or Dr. Wilcox in their prior communications, Dr. Wilcox testified that Defendant uses these precautions when dealing with an individual who is hostile, aggressive, or displaying behavior that is not appropriate for a school setting.  Dr. Wilcox testified that he could not recall the conversation he had with Ms. Wilson after she communicated with Plaintiff about scheduling an in-person meeting and, therefore, he could not say whether Plaintiff yelled at or threatened Ms. Wilson.

On October 23, 2015, Plaintiff cancelled the October 26 meeting without explanation.  His voicemail stated: ". . . this is Todd Johnson, um, my appointment with Bob, uh, Dr. Wilcox, on Monday, you can cancel that.  That is all you need to know."[92]  Dr. Wilcox does not recall whether he ever personally reviewed Plaintiff's resume or applications, spoke to the hiring

---

[91] Doc. 46-17 at 2.

[92] Pretrial Order, Doc. 38 at 8–9, ¶ 57.

managers for the positions for which Plaintiff applied, or contacted Plaintiff's references.  Dr.
Wilcox never met Plaintiff in person or communicated with him verbally.

On October 27, 2015, Plaintiff applied for a position as a Principal's Secretary/Treasurer.
Plaintiff was one of thirty-eight applicants for this position.  Again, Plaintiff had no prior
experience as a secretary in an elementary, middle, or high school, nor did his application reflect
any specific experience as a secretary or treasurer.  Although Plaintiff testified to some
accounting and bookkeeping experience from prior work in a non-school setting, his resume did
not specifically describe that experience.[93]  His resume did reference his experience handling
budgeting and expenses during his time as a basketball coach.[94]  Plaintiff was neither
interviewed nor hired for the Principal's Secretary/Treasurer position.

On the same date, Dr. Wilcox sent an email to Dr. Mather, Ms. Beech, and others stating
that he was mailing a letter to Plaintiff "which will indicate that at this time his applications are
not being screened for further review.  Please plan to close all current applications and flag
accordingly tomorrow to correspond with his receipt of this letter."[95]  The following afternoon,
Dr. Wilcox directed his staff to "proceed with closing out applications for Todd Johnson.  Mr.
Johnson has displayed some threatening actions that have heightened our level of concern over
the safety and well-being of those who might schedule a time to meet with him."[96]  Thus, Dr.
Wilcox made the decision to no longer screen Plaintiff's applications for any position going
forward.  Although Dr. Mather's testimony is unclear about whether her approval was required
before Dr. Wilcox could send the letter to Plaintiff, she nonetheless approved and supported his

---

[93] Doc. 46-33 at 11.

[94] *Id*. at 9–10.

[95] Doc. 46-18 at 2.

[96] Doc. 46-19 at 2.

decision. Dr. Mather never met Plaintiff, communicated with him personally, reviewed his past correspondence, or discussed him with Ms. Beech prior to Dr. Wilcox sending the October 28, 2015 letter.

Dr. Wilcox's October 28, 2015 letter to Plaintiff stated, in part, that "[b]ased upon a review of your recent communications both verbally and in writing starting on or around October 12, 2015, we will not proceed at this time with further consideration of your application for employment."[97] Dr. Wilcox does not recall communicating to Plaintiff—prior to sending the October 28 letter—that he believed Plaintiff was behaving in a threatening or inappropriate manner. Although Dr. Wilcox testified that he has declined to continue screening applications from individuals in the past, he could not recall the specific circumstances of those situations. Ms. Beech testified that she specifically recalled one prior instance of flagging a former employee as ineligible for future employment, and that that decision was based on the individual's multiple offenses for drunken driving.

On or about March 10, 2016, the University of Kansas Cancer Center issued a letter stating that Plaintiff was able to engage in substantial activities and return to work without restrictions. Plaintiff testified that he needed this letter for some purpose, but could not recall precisely why. There is no evidence in the record to suggest that Defendant ever asked Plaintiff to provide such a letter in connection with the applications he submitted in the fall of 2015.

On April 26, 2016—despite having been informed that he would no longer be considered for employment within the school district—Plaintiff applied for the part-time position of High School Head Varsity Boys' Basketball Coach. Defendant received a total of thirty-six applications for this position, which required either a valid Kansas teaching certificate or a Rule

---

[97] Doc. 46-20 at 2.

10 Certification, neither of which Plaintiff had, though Plaintiff believed that obtaining

certification would be an "easy process."[98]  Plaintiff also lacked any prior head coaching

experience for a Kansas high school basketball program.  The individual Defendant hired to fill

this position had both a valid Kansas teaching certificate and prior experience as a varsity head

coach for a Kansas boys' high school basketball team.  Plaintiff was never considered for this

position.

## IV.    Analysis

The ADA provides that "[n]o covered entity shall discriminate against a qualified

individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of

employees. . . ."[99]  However, the ADA does not "requir[e] affirmative action in favor of

individuals with disabilities, in the sense of requiring that disabled persons be given priority in

hiring . . . over those who are not disabled.  It prohibits employment discrimination against

qualified individuals with disabilities, no more and no less."[100]

"To establish a prima facie case of discrimination under the ADA, a plaintiff must show

(1) that he is disabled within the meaning of the ADA; (2) that he is qualified, with or without

reasonable accommodation, to perform the essential functions of the job held or desired; and (3)

that he was discriminated against because of his disability."[101]  Where, as here, the plaintiff

offers circumstantial rather than direct evidence of discrimination, the three-step burden-shifting

---

[98] Deposition of Todd Johnson, Doc. 46-1 at 38:8–10.

[99] 42 U.S.C. § 12112(a).

[100] *Daugherty v. City of El Paso*, 56 F.3d 695, 700 (5th Cir. 1995).

[101] *Kilcrease v. Domenico Transp. Co*., 828 F.3d 1214, 1218–19 (10th Cir. 2016) (quoting *Davidson v. Am. Online, Inc*., 337 F.3d 1179, 1188 (10th Cir. 2003)) (ADA failure-to-hire case).

framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*[102] applies.[103] Under that analysis:

> A plaintiff carries the burden of raising a genuine issue of material fact on each element of his prima facie case. If plaintiff establishes a prima facie case, the burden shifts to the defendant to offer a legitimate nondiscriminatory reason for its employment decision. If defendant articulates a nondiscriminatory reason, the burden shifts back to plaintiff to show a genuine issue of material fact as to whether the defendant's reason for the adverse employment action is pretextual.[104]

Plaintiff applied for thirteen positions with Defendant in the fall of 2015.[105]  Of those thirteen, two were filled before Plaintiff submitted his application (Family Service Worker and Short-Term Suspension Monitor), and one was never filled due to budgetary constraints (Middle School Applications Teacher).  Plaintiff withdrew from consideration for two additional positions (Substitute Teacher and Assistant Middle School Boys' Basketball Coach).  Thus, the eight positions that remain at issue in this motion are: (1) High School Treasurer; (2) Truancy Program Specialist; (3) Parent Liaison/Recovery Room Teacher; (4) Para Educator; (5) Principal's Secretary; (6) Athletic Secretary/Assistant Principal; (7) Principal's Secretary/Treasurer; and (8) High School Head Varsity Boys' Basketball Coach.[106]

---

[102] 411 U.S. 792 (1973).

[103] *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013) (citing *Ramsey v. City & Cty. of Denver*, 907 F.2d 1004, 1008 (10th Cir. 1990)); *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1038 (10th Cir. 2011) (citing *MacKenzie v. City & Cty. of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005)).

[104] *Kilcrease*, 828 F.3d at 1220 (quoting *Davidson*, 337 F.3d at 1189) (citing *McDonnell Douglas Corp.*, 411 U.S. at 802–03).

[105] The parties' briefing states that Plaintiff applied for fourteen positions, but it appears that the parties are including in that total two applications for assistant basketball coaching positions.

[106] Defendant contends in its Reply brief that two of these positions—Athletic Secretary/Assistant Principal and Principal's Secretary/Treasurer—are not at issue because Plaintiff failed to identify them in his interrogatory responses or his contentions in the Pretrial Order.  As set forth above in Section II, the parties stipulated that Plaintiff applied for these positions in the Pretrial Order (Doc. 38 at 8) and Defendant attempted to submit affidavits to establish that other applicants were better qualified for these positions.  The Court considers these positions to be at issue.

With regard to the Parent Liaison/Recovery Room Teacher position, Defendant contends that Plaintiff cannot satisfy the second element of a prima facie case because Plaintiff did not possess the requisite skill, training, and experience for that position, which required a Kansas Emergency Substitute Certificate that Plaintiff did not possess.  Although Defendant deals with the High School Head Varsity Boys' Basketball Coach position only in a footnote to its argument, Defendant contends that Plaintiff was also "not qualified for this position because he did not have a valid Kansas Teaching License or KSHAA Rule [10] Certification."[107]  Defendant further argues that this coaching position was part-time, and that Plaintiff had previously indicated that he was interested in only full-time work.

With respect to the remaining six positions, Defendant concedes that Plaintiff "arguabl[y] met the minimal job requirements based on his experience, education, and training such that any could serve as a basis for Plaintiff's failure to hire claim."[108]  Defendant argues, however, that Plaintiff cannot establish a prima facie case of discrimination because he cannot show that Defendant discriminated against him due to his disability when it did not hire him for these positions.  Finally, Defendant argues that Plaintiff's claims are limited to positions "that were vacant and for which he submitted an application and was otherwise qualified."[109]  Plaintiff argues that also at issue is Defendant's decision to cease considering Plaintiff for *any* type of employment after October 28, 2015.

## A.    Elements of a Prima Facie Case

As an initial matter, Defendant contends that it is entitled to summary judgment solely on the basis of the March 2016 letter from Plaintiff's physician at the University of Kansas Cancer

---

[107] Doc. 44 at 27, n.2.

[108] *Id.* at 28.

[109] *Id.*at 26.

Center releasing Plaintiff to return to work.  Defendant contends that because Plaintiff was not released to work until March 2016, he could not perform the essential functions of any position to which he applied before that time.  In addition to the fact that this argument ignores Defendant's decision to cease considering Plaintiff for *any* future employment after October 28, 2015, Plaintiff also testified that his physician provided this letter at his request.  Plaintiff argues that "he simply attained the letter from his treating physician, so he would not have issues with future employers whom [sic] might question whether he could perform certain activities."[110]

Plaintiff points out that there is no evidence in the record to suggest that Defendant ever asked Plaintiff for documentation of his ability to return to work, and argues that Defendant cannot assert after the fact that Plaintiff was unable to perform the essential functions of the jobs he sought.  The Court agrees that Defendant has pointed to no evidence in the record to refute Plaintiff's contention that the March 2016 letter was issued at his request and that he was able to return to work in the fall of 2015 when he began applying for re-employment with Defendant. Defendant's argument that the March 2016 letter precludes all of Plaintiff's claims is without merit, and the Court will therefore consider whether Plaintiff has satisfied the elements of a prima facie case.

The parties do not dispute that Plaintiff is disabled within the meaning of the ADA. Thus, to satisfy the elements of a prima facie case of disability discrimination, Plaintiff need only show that he was qualified, with or without reasonable accommodation, to perform the essential functions of a position to which he applied and that he was discriminated against because of his disability.  Defendant argues that Plaintiff cannot satisfy the second element of a prima facie case with respect to the Parent Liaison/Recovery Room Teacher and High School Head Varsity Boys'

---

[110] Doc. 46 at 79.

Basketball Coach positions because he was not qualified for those jobs, and that Plaintiff cannot satisfy the third element of a prima facie case with respect to any position because Defendant did not discriminate against him based on his disability.  In addition to analyzing the specific positions to which Plaintiff applied, the Court will also analyze Defendant's decision not to consider Plaintiff for any employment as of October 28, 2017.

      **1.**        **Second Element of a Prima Facie Case—Plaintiff's Qualification for Parent Liaison/Recovery Room Teacher and High School Head Varsity Boys' Basketball Coach Positions**

Under the ADA, a "qualified individual" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."[111]  "As a condition to performing the essential functions of an employment position, however, an individual must first satisfy the 'requisite skill, experience, education and other job-related requirements of the employment position.'"[112] With regard to Plaintiff's qualifications, "[t]he relevant inquiry at the prima facie stage is not whether an employee or potential employee is able to meet all the objective criteria adopted by the employer, but whether the employee has introduced some evidence that [he] possesses the objective qualifications necessary to perform the job sought."[113]  As the Tenth Circuit has explained:

> [T]o establish a prima facie case, the employee need only put forward credible evidence that he meets the employer's objective requirements necessary to perform the job.  A failure to satisfy either subjective criteria, or objective qualifications "that have no bearing

---

[111] 42 U.S.C. § 12111(8).

[112] *Kilcrease v. Domenico Transp. Co.*, 828 F.3d 1214, 1219 (10th Cir. 2016) (quoting *Tate v. Farmland Indus., Inc.*, 268 F.3d 989, 993 (10th Cir. 2001)) (first alteration in original).

[113] *Id.* at 1220 (quoting *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1193 (10th Cir. 2000)).

on an applicant's ability to perform the job sought," cannot be used to defeat a plaintiff's prima facie case.[114]

Defendant contends that Plaintiff cannot establish a prima facie case of discrimination with respect to the Parent Liaison/Recovery Room Teacher position because it required a substitute teaching certificate that Plaintiff did not have.  While it is true that "an individual who fails to satisfy job prerequisites cannot be considered 'qualified' within the meaning of the ADA unless [he] shows that the prerequisite is itself discriminatory in effect,"[115] the job posting for this position actually states that candidates must "[h]ave *or be able to obtain* [an] Emergency Substitute Certificate."[116]  Defendant points to no facts in the record establishing that Plaintiff would not have been able to obtain the required certification or was otherwise unqualified.  In fact, despite Plaintiff not having an Emergency Substitute Certificate, Ms. Beech forwarded his application to two school principles for review.[117]  Because Defendant's only argument that Plaintiff was not qualified for the Parent Liaison/Recovery Room Teacher position is that Plaintiff lacked an Emergency Substitute Certificate at the time he applied—and the job posting expressly states that applicants need only be able to *obtain* such a certificate—the Court finds

---

[114] *Id*. at 1220–21 (quoting *Horizon/CMS Healthcare Corp*., 220 F.3d at 1193–94) (internal and other citations omitted).

[115] *Johnson v. Bd. of Trustees of Boundary Cty. Sch. Dist. No. 101*, 666 F.3d 561, 567 (9th Cir. 2011) (finding that employer was not required to provide reasonable accommodation to disabled candidate for teaching position by allowing her to teach prior to obtaining the required certification); *Kocsis v. Multi-Care Mgmt., Inc*., 97 F.3d 876, 883 (6th Cir. 1996) (affirming summary judgment on failure-to-promote claim where nurse plaintiff introduced no evidence that having specific certification was not a genuine prerequisite of the position she sought); *Herron v. Peri & Son's Farms, Inc*., No. 3:13-cv-00075-HDM, 2014 WL 1917934, at *5 (D. Nev. May 13, 2014) (finding no triable issue of fact as to whether plaintiff was qualified where job required a "certificate of completion from a certified technical school or equivalent" and plaintiff had no such certificate).

[116] Doc. 46-27 at 3 (emphasis added).

[117] Although not pertinent to the Court's inquiry at the prima facie stage, Defendant offers no evidence that the individual hired for the Parent Liaison/Recovery Room Teacher position did possess such certification at the time she was hired.  Rather, Defendant's statement of uncontroverted facts merely indicates that the successful candidate was already employed by Defendant and that her position was being eliminated as part of a reduction in force.

that Plaintiff has raised a genuine issue of material fact as to the second element of a prima facie case with respect to this position.

The Court reaches the opposite conclusion with respect to the High School Head Varsity Boys' Basketball Coach job opening and finds that Plaintiff has not raised a genuine issue of material fact as to the second element of a prima facie case. Plaintiff does not dispute that unlike the Parent Liaison/Recovery Room Teacher position, this position required applicants to possess—rather than be able to obtain—either a valid Kansas teaching certificate or a Rule 10 Certification.[118] Although Plaintiff had neither, he nonetheless disputes that he was unqualified, citing his belief that he easily could have obtained certification or that his NCAA certification with LexisNexis allowed him Rule 10 certification. Plaintiff offers no evidence that the two types of certification are, in fact, equivalent, and his subjective belief that they are equivalent creates no material issue of genuine fact where Plaintiff concedes that certification was a required qualification for all applicants.[119] Plaintiff cannot establish a prima facie case of disability discrimination with respect to the High School Head Varsity Boys' Basketball Coach because he has failed to raise a genuine issue of material fact regarding his qualification for that position.

---

[118] Doc. 46 at 41, ¶ 136.

[119] *Herron*, 2014 WL 1917934, at *5 (rejecting plaintiff's argument that he was qualified under an "equivalent" type of certification for mechanic position where plaintiff presented "no evidence to support his counsel's conclusory assertion that his ASE certificates might be equivalent to a certificate of completion from a certified technical school.").

2.    **Third Element of a Prima Facie Case—Discrimination Based on Disability with Respect to Parent Liaison/Recovery Room Teacher Position and Remaining Six Positions to which Plaintiff Applied Before October 28, 2015**

The Court next examines whether Plaintiff has raised a genuine issue of material fact as to the third element of a prima facie case with respect to the Parent Liaison/Recovery Room Teacher position and the remaining six positions to which Plaintiff applied before October 28, 2015, when Defendant ceased considering his applications. The Court has already found that Plaintiff has raised a genuine issue of material fact with respect to the second element of a prima facie case for the Parent Liaison/Recovery Room Teacher position, and Defendant concedes that Plaintiff met the minimum job requirements of the remaining six positions to which he applied in 2015 based on his experience, education, and training.

To establish the third element of a prima facie case—that Plaintiff suffered an adverse employment action due to his disability—Plaintiff "must produce evidence from which a rational jury could conclude the employer took those actions *because of* his disability."[120]  "Although this burden is 'not onerous,' it is also 'not empty or perfunctory.'  In essence, the plaintiff must present evidence that, if the trier of fact finds it credible, and the employer remains silent, he could be entitled to judgment as a matter of law."[121]

---

[120] *Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 898 (10th Cir. 2017) (emphasis in original) (citing *MacKenzie v. City & Cty. of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005); *Sandoval v. City of Boulder*, 388 F.3d 1312, 1327 (10th Cir. 2004)); *see also E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1038 (10th Cir. 2011) ("[A] plaintiff generally must show that he has suffered an 'adverse employment action because of the disability.'") (quoting *Mathews v. Denver Post*, 263 F.3d 1164, 1167 (10th Cir. 2001)) (other citations omitted).

[121] *Heffernan v. Provident Life & Acc. Ins. Co.*, 45 F. Supp. 2d 1147, 1155 (D. Kan. 1999) (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)) (internal citation omitted); *see also Patterson v. Goodyear Tire and Rubber Co.*, No. 08-2060-EFM, 2011 WL 1484153, at *7 (D. Kan. Apr. 19, 2011) ("Plaintiff is required 'to present some affirmative evidence that disability was a determining factor in the employer's decision.'") (quoting *Morgan*, 108 F.3d at 1323–24).

Both parties make essentially the same arguments with respect to the third element of a prima facie case as they make regarding pretext.  Plaintiff argues that at the time he applied for the positions at issue, he was a former employee who had resigned in good faith, with the understanding that he would be considered in the future for positions for which he was qualified.  Although Plaintiff relies in part on the assumption that his prior employment with Defendant should have made him "an excellent hire for USD 500,"[122] Plaintiff also cites *Sorbo v. United Parcel Service*[123]  and argues that the fact that he was treated differently than other candidates during the application and interview process is evidence of discriminatory intent.  Further, relying on *E.E.O.C. v. C.R. England, Inc.*,[124] Plaintiff argues that Defendant's failure to investigate his complaint of discrimination establishes discriminatory intent.

Defendant argues that no inference of unlawful discrimination arises from its decision not to hire Plaintiff because it received numerous applications for the positions to which Plaintiff applied, those applications were screened by the managers responsible for making hiring recommendations, and "the decision to interview particular applicants for an open position was made by those individuals authorized to make the hiring recommendations based upon legitimate nondiscriminatory business reasons."[125]  Defendant also argues that due to Plaintiff's increasingly agitated communications throughout October 2015, "Plaintiff simply did not exhibit

---

[122] Doc. 46 at 83.

[123] 432 F.3d 1169 (10th Cir. 2005).  In *Sorbo*, the Tenth Circuit explained that while comparison to others similarly situated is not required to make out a prima facie case, the plaintiff may choose to present evidence that he was treated differently to raise an inference of discrimination.  *Id.* at 1173–74.  However, the Tenth Circuit also stated that "whether [the] analysis [of differing treatment] is conducted in reference to the prima facie case or the business justification versus pretext inquiry . . . if the court correctly concludes that the evidence of discrimination/pretext fails as a matter of law, summary judgment for the defendant is the proper result."  *Id.* at 1174.

[124] 644 F.3d 1028.

[125] Doc. 44 at 29.

behavior that would be conducive to working in an environment with students, faculty and parents."[126]

At the prima facie stage, when the plaintiff establishes his "qualifications with 'credible evidence that [he] was qualified for the position [he] sought,'"[127] the Court may not consider an "employer's claim that an employee was less qualified than the employee promoted or hired."[128] Rather, such evidence should be considered when determining whether the employer's reasons for the employment action are legitimate or pretextual.[129]  Here, Defendant concedes that Plaintiff was qualified, and Defendant's arguments concerning its reasons for not hiring Plaintiff are better left for the pretext phase of the Court's analysis.  The Court therefore assumes that Plaintiff has satisfied the third element of a prima facie case with regard to the positions of Parent Liaison/Recovery Room Teacher, High School Treasurer, Truancy Program Specialist, Para Educator, Principal's Secretary, Athletic Secretary/Assistant Principal, and Principal's Secretary/Treasurer.  The burden therefore shifts to Defendant to articulate a nondiscriminatory purpose for the adverse employment actions.  Defendant has done so, stating that it hired other candidates due to their superior qualifications or based on business needs and, further, that Plaintiff's communications with Defendant's staff revealed him to be unfit for a position in a school environment.  Thus, the burden returns to Plaintiff to show by a preponderance of the evidence that the nondiscriminatory reasons offered are merely pretext.

---

[126] *Id.* at 30 (emphasis omitted).

[127] *Kilcrease v. Domenico Transp. Co.*, 828 F.3d 1214, 1220 (10th Cir. 2016) (quoting *Kenworthy v. Conoco, Inc.*, 979 F.2d 1462, 1470 (10th Cir. 1992)).

[128] *Id.*

[129] *Id.* (stating that "consideration of the employer's reasons for an adverse action is premature at the prima facie stage . . . [and] that such evidence is properly considered only in addressing whether the employer's reasons are legitimate or pretextual.") (citing *Kenworthy*, 979 F.2d at 1470).

### 3. Defendant's Decision to Cease Considering Plaintiff for Any Position After October 28, 2015

Before turning to the next phase of the analysis required under the *McDonnell Douglas* burden-shifting framework, the Court must address Plaintiff's contention that his discrimination claim is valid not just with respect to the specific positions to which he applied, but is also based on Defendant's decision to cease all consideration of Plaintiff for future employment. Relying largely on cases involving retaliation claims, Plaintiff argues that his future employment opportunities were harmed because of Defendant's discriminatory decision to bar him from *any* employment in the district.[130] Defendant argues that Plaintiff's claims are limited to positions to which he actually applied and for which he was qualified, and that Plaintiff has not asserted a claim for retaliation.

It is true that neither Plaintiff's Charge of Discrimination nor his Complaint contains a claim for retaliation.[131] It is also true that the Court cannot analyze whether Plaintiff is qualified for jobs to which he has not yet applied. However, the Tenth Circuit has held in the Title VII retaliation context that that:

> [A]n act by an employer that does more than de minimus harm to a plaintiff's future employment *prospects* can, when fully considering 'the unique factors relevant to the situation at hand,' be regarded as

---

[130] Doc. 46 at 84–85 (citing *Hillig v. Rumsfeld*, 381 F.3d 1028 (10th Cir. 2004) (judgment as a matter law in defendant's favor on Title VII retaliation claim was improper where plaintiff showed that negative references seriously harmed her future employment opportunities and constituted an adverse employment action); *McKenzie v. Dovala*, 242 F.3d 967 (10th Cir. 2001) (summary judgment on disability discrimination claim improper where sheriff refused to accommodate plaintiff by considering her for position in which she would not pose a threat to the public); *Sink v. Wal-Mart Stores, Inc.*, 147 F. Supp. 2d 1085 (D. Kan. 2001) (summary judgment on retaliation claim improper where there was evidence that defendant deemed plaintiff ineligible for rehiring due to prior filing of discrimination charge with EEOC)).

[131] *See* Docs. 1, 1-1. If Plaintiff had brought a retaliation claim and was able to satisfy the elements of a prima facie case, he would still have to show a genuine issue of material fact in response to Defendant's assertion of a legitimate, non-discriminatory reason for the adverse employment action—just as he is required to show after establishing a prima facie case of discrimination. *Sink v. Wal-Mart Stores, Inc.*, 147 F. Supp. 2d 1085, 1096 (citing *Selenke v. Medical Imaging of Colo.*, 248 F.3d 1249, — (10th Cir. 2001)).

an 'adverse employment action,' even where the plaintiff does not show the act precluded a particular employment *prospect*.[132]

Defendant sent Plaintiff a letter on October 28, 2015 stating that it would consider neither Plaintiff's pending applications nor his future applications. Thus, this is not a situation in which Plaintiff never applied for a job,[133] but one in which he was essentially told not to apply going forward. The Court therefore assumes without deciding that Plaintiff can state a discrimination claim based on Defendant's alleged refusal to consider him for any employment whatsoever due to his disability after October 28, 2015. However, the technicalities of which positions form the basis for Plaintiff's disability discrimination claim ultimately matter little here. As set forth below, the Court finds that Defendant has offered legitimate, non-discriminatory reasons for not hiring Plaintiff—both for the specific positions to which he applied and for any position to which he might apply in the future—and Plaintiff has failed to show a genuine issue of material fact as to whether Defendant's stated reasons are pretextual.

### B.    Defendant Has Articulated Legitimate, Non-Discriminatory Reasons for Its Adverse Employment Decisions and Plaintiff Has Not Shown a Genuine Issue of Material Fact as to Whether Those Reasons Are Pretextual

If the plaintiff establishes a prima facie case of discrimination, "the . . . burden shifts to the defendant to articulate a facially nondiscriminatory reason for the challenged employment action."[134] While the defendant need not prove at this stage that its non-discriminatory motivation for the decision was "bona fide," the reason articulated must be "reasonably specific

---

[132] *Hillig*, 381 F.3d at 1033 (quoting *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986–87 (10th Cir. 1996)) (emphasis in original) (internal citation omitted).

[133] *See, e.g.*, *Velez v. Janssen Ortho, LLC*, 467 F.3d 802, 807 (1st Cir. 2006) (holding in retaliatory failure-to-hire case under ADA, where plaintiff sent general letters expressing interest in any available job, that there can be no failure-to-hire claim in the absence of an application to a specific job).

[134] *Beams v. Norton*, 256 F. Supp. 2d 1203, 1214–15 (D. Kan. 2003) (citing *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973)).

and clear."[135] Defendant has met its burden here, stating that it hired candidates other than Plaintiff due to their superior qualifications or based on business needs and, further, that Plaintiff's communications with Defendant's staff revealed him to be unfit for a position in a school environment.  Thus, the burden returns to Plaintiff to show by a preponderance of the evidence that the nondiscriminatory reasons offered are merely pretext.

A plaintiff may "demonstrate[] pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence."[136]  In other words, "a plaintiff can establish pretext by showing the defendant's proffered nondiscriminatory explanations for its actions are 'so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude [they are] unworthy of belief.'"[137]

Evidence of pretext "may take a variety of forms," and a plaintiff "may not be forced to pursue any particular means of demonstrating that [a defendant's] stated reasons are pretextual."[138]  The Tenth Circuit has explained:

> A Plaintiff typically makes a showing of pretext in one of three ways: (1) with evidence that the defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances; or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff.[139]

---

[135] *Id.* at 1215 (quoting *E.E.O.C. v. Flasher Co.*, 986 F.2d 1312, 1316 (10th Cir. 1992)).

[136] *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1218 (10th Cir. 2003) (quoting *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1455 (10th Cir. 1994)).

[137] *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1038–39 (quoting *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010)) (alteration in original) (other citations omitted).

[138] *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000) (quoting *Patterson v. McLean Credit Union*, 491 U.S. 164, 187–88 (1989)).

[139] *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017) (quoting *Kendrick*, 220 F.3d at 1230).

A plaintiff may also "show pretext on a theory of disparate treatment by providing evidence that he was treated differently from other similarly situated, non-protected employees."[140]

However, "[m]ere allegations are insufficient,"[141] and "[t]he plaintiff's own conclusory opinions about his qualifications and about the employer's motives do not give rise to a material factual dispute."[142]  In other words, "[c]ourts 'examine the facts as they appear to the person making the decision, not the plaintiff's subjective evaluation of the situation.'"[143]  In deciding whether the plaintiff has raised a genuine issue of  material fact as to pretext, "the court 'must consider the evidence as a whole.'"[144]  "Regardless of which theory of pretext the plaintiff asserts, '[the Court's] role isn't to ask whether the employer's decision was wise, fair or correct, but whether [it] honestly believed [the legitimate, nondiscriminatory] reasons [it gave for its conduct] and acted in good faith on those beliefs."[145]

Defendant's first stated reason for its adverse employment actions is that it hired individuals other than Plaintiff for legitimate, non-discriminatory business reasons.  Indeed, the uncontroverted facts establish that Defendant could have reasonably deemed the candidate hired for the High School Treasurer position better qualified than Plaintiff based on accounting experience, as that individual was a college student working toward an accounting degree.  Similarly, the person hired for the Truancy Program Specialist position was already working for

---

[140] *Neal v. Sandia Nat'l Labs.*, 157 F. App'x 67, 70 (10th Cir. 2005) (quoting *Kendrick*, 220 F.3d at 1232)).

[141] *Beams v. Norton*, 256 F. Supp. 2d 1203, 1215 (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1324 (10th Cir. 1997)).

[142] *Id.* (quoting *Bullington v. United Airlines*, 186 F.3d 1301, 1318 (10th Cir. 1999), *implicitly overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)).

[143] *Brown v. S. Cent. Kan. Educ. Serv. Ctr.*, Case No. 16-1314-EFM, 2018 WL 1942271, at *4 (D. Kan. Apr. 25, 2018) (*quoting Lobato v. N.M. Env't Dep't*, 733 F.3d 1283, 1289 (10th Cir. 2013)).

[144] *Beams*, 256 F. Supp. 2d at 1215 (quoting *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1250 (10th Cir. 2002)).

[145] *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017) (quoting *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010)) (first alteration added; remaining alterations in original).

Defendant as a migrant data specialist, had prior experience as an attendance secretary, and was familiar with Defendant's attendance process, how truancy is handled within the school district, student data programs, district operations, and Kansas truancy laws.  Further, the individual hired for the Para Educator job had previous employment experience providing care, supervision, and assistance to emotionally disturbed children in a group home.

Plaintiff does not offer any argument concerning his qualifications being superior and, as the Tenth Circuit has explained:

> an important distinction exists between minimum qualifications—those that are absolutely mandatory to be eligible for a position—and other positive attributes that set competing candidates apart. The former are relevant at the first stage of the *McDonnell Douglas* analysis; a candidate that is not minimally qualified fails to make out a prima facie case of discrimination.  But the latter may legitimately be used to differentiate between minimally qualified candidates; a candidate may be minimally qualified, yet lack the skill set and experience other candidates offer. . . .[146]

Thus, "to suggest that an employer's claim that it hired someone else because of superior qualifications is pretext for discrimination rather than an honestly (even if mistakenly) held belief, a plaintiff must come forward with facts showing an 'overwhelming' 'disparity in qualifications.'"[147]  This, Plaintiff has not even attempted to do.[148]

Further, regarding the Parent Liaison/Recovery Room Teacher position, Defendant states that the individual hired was already employed by Defendant and her position was being

---

[146] *Doyle v. Nordam Group, Inc.*, 492 F. App'x 846, 851 (10th Cir. 2012).

[147] *Johnson,* 594 F.3d at 1211 (quoting *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1309 (10th Cir. 2005)); *see Hamilton v. Okla. City Univ.*, 563 F. App'x 597, 601 (10th Cir. 2014) (noting that courts should only "draw an inference of pretext where the facts assure [it] that the plaintiff is better qualified than the other candidates for the position.") (quoting *Santana v. City and Cty. of Denver*, 488 F.3d 860, 865 (10th Cir. 2007)).

[148] *See Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (citing *Alexander v. Fulton Cty., Ga.*, 207 F.3d 1303, 1341 (11th Cir. 2000) ("A Plaintiff is not allowed to recast an employer's proffered non-discriminatory reasons or substitute his own business judgment for that of the employer.  Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed simply by quarrelling with the wisdom of that reason.").

eliminated as part of a reduction in force.  While the Court cannot compare the successful candidate's qualifications to Plaintiff's qualifications based on the facts in the record, the Court nonetheless finds that the selection of a current employee who would otherwise be affected by a layoff may be a legitimate, non-discriminatory business reason for a hiring decision.  For the positions to which he applied in September 2015 (High School Treasurer, Truancy Program Specialist, Para Educator, and Parent Liaison/Recovery Room Teacher), Plaintiff has failed to show that Defendant's stated legitimate, non-discriminatory business reasons for not hiring him are false, incoherent, weak, or unworthy of credence.

With respect to the remaining positions at issue—Principal's Secretary, Athletic Secretary/Assistant Principal, and Principal's Secretary/Treasurer—the Court has before it no evidence of the credentials of the successful applicants.[149]  However, Defendant has raised a second legitimate, non-discriminatory business reason for its decision not to hire Plaintiff for any position, including these three positions—all of which he applied to on or after October 12, 2015. Defendant states that "Plaintiff simply did not exhibit behavior that would be conducive to working in an environment with students, faculty and parents based upon his behavior toward Defendant's staff during the month of October 2015."[150]

Plaintiff argues that this reason is pretextual and that Defendant's disparate treatment of him during the interview process, its failure to follow its own anti-discrimination policy, and its decision to stop screening his applications for any *future* employment, are all evidence of pretext.

---

[149] As set forth above in Section II, the Court grants Plaintiff's motion to strike with respect to the affidavits Leala Taylor, Phyllis Olbert, and Jewel Ragsdale, who would have attested to the qualifications of the individuals hired for these positions.

[150] Doc. 44 at 30.  The Court does not consider arguments and evidence submitted by Defendant in its reply that Plaintiff was hostile and abusive toward his healthcare providers, as there is no indication that Defendant was aware of Plaintiff's behavior toward his doctors, or any other third-parties, during the time period at issue.  *See* Doc. 50 at 1–3.

Plaintiff argues that he is the only applicant that Ms. Beech and Dr. Wilcox can recall "flagging" with security personnel, and that "contradictory statements from key employees in Defendants' H.R. Department, combined with the lack of any evidence indicating threatening conduct by Plaintiff, contribute to a showing of pretext."[151]  Plaintiff points to multiple instances where Ms. Beech and/or Dr. Wilcox testified that they did not consider the tone of certain of Plaintiff's communications to be unprofessional, rude, disrespectful, or threatening.[152]  Plaintiff also argues that Defendant's stated reason for not hiring Plaintiff is "beyond meritless" given that Dr. Wilcox never met Plaintiff in person, communicated with him verbally, or advised him that his behavior was inappropriate.[153]  Plaintiff argues that the evidence suggests he was "simply trying to understand why he had not been re-hired at USD 500."[154]

As a whole, the uncontroverted facts establish that Ms. Beech communicated with Plaintiff over the course of several weeks in the fall of 2015 about various open positions and the hiring process, advised Plaintiff of additional information needed for his applications, and forwarded his applications to hiring managers.  Plaintiff received multiple interviews, but became increasingly frustrated as time passed without a job offer.  On or around October 12, 2015, Plaintiff began sending a series of emails that caused Dr. Wilcox some concern based on his experience as an HR professional.  Thus, Dr. Wilcox ordered certain security precautions should Plaintiff make an unannounced visit to school property.  While Ms. Beech and Dr. Wilcox did not testify that no other employment candidate had ever been flagged by security, as Plaintiff suggests, it is true that they could not recall the specific circumstances of any prior case.

---

[151] Doc. 46 at 92.

[152] *Id*. at 87–89.

[153] *Id*. at 90.

[154] *Id*.

On October 19, 2015, Plaintiff emailed Ms. Beech to express his belief that he was being "passed over for positions based of [sic] my disabled state."[155]  On October 28, 2015, Dr. Wilcox decided to cease considering Plaintiff for any type of employment within the school district due to Plaintiff's "recent communications both verbally and in writing starting on or around October 12, 2015."[156]  While the uncontroverted facts do not establish that Defendant initiated an investigation into Plaintiff's October 19 email complaint, only nine days passed between that complaint and Dr. Wilcox's decision to stop considering Plaintiff for any type of employment. During that time, Plaintiff continued to communicate in a manner that Dr. Wilcox viewed as threatening and unbefitting an applicant for employment with the school district.[157]  Ms. Beech recalled only one prior instance in which Defendant had declined to consider an applicant for any possible future employment, and Dr. Wilcox recalled no specifics of any similar, prior case.

Defendant asserts that its decision to flag Plaintiff with security and ultimately to cease considering Plaintiff for any employment were the result of Plaintiff's email and voicemail communications that were confrontational, hostile, or threatening in nature.  Defendant argues that Plaintiff's personal, subjective belief that Defendant's actions were motivated by Plaintiff's disability is not evidence of pretext, and that "[a]n actual threat of physical violence is not required before Dr. Wilcox, an experienced Human Resource professional, could make a determination based on Plaintiff's behavior that he was not an appropriate candidate for employment with the school district."[158]  The Court agrees that Plaintiff has failed to show a

---

[155] Doc. 46-15 at 3.

[156] Doc. 46-20 at 2.

[157] *See* Doc. 46-15 at 3; Doc. 46-17 at 2.

[158] Doc. 50 at 101.

genuine dispute of material fact regarding whether a discriminatory motivation lies behind Defendant's neutral explanation for its adverse employment decisions.

Starting with Plaintiff's contention that Defendant treated him differently than other similarly situated, non-disabled candidates during the interview process by instituting certain security precautions and by ceasing all consideration of his applications, "[t]he burden is on the plaintiff to demonstrate he is similarly situated to the employees to whom he is comparing himself."[159]  There is no evidence in this case to suggest that any other candidate for employment communicated with Defendant in a similar manner and tone as Plaintiff did[160] and, contrary to Plaintiff's assertion, he has failed to show that Defendant "enforced company policies more strictly against [him] than against other similarly situated employees."[161]  The fact that Plaintiff never physically threatened or cursed at Defendant's staff—and that Defendant's staff members testified to differing perceptions of Plaintiff's conduct—does not establish that Defendant's stated reason for not hiring Plaintiff is pretextual, because behavior surely need not rise to that level for a school district to make a legitimate, non-discriminatory business decision that a candidate does not display the personality or temperament it seeks in applicants.

---

[159] *Kelley v. Goodyear Tire and Rubber Co*., 220 F.3d 1174, 1178–79 (10th Cir. 2000) (finding that the record revealed "no similarly situated individuals" where Title VII plaintiff presented no other applicant who was accepted despite submitting an incomplete application and performing poorly in interview).

[160] *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000) ("A plaintiff who wishes to show that the company acted contrary to an unwritten policy or to company practice often does so by providing evidence that he was treated differently from other similarly-situated employees *who violated work rules of comparable seriousness.*") (citing *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997)) (emphasis added); *Smith v. Lockheed Martin Corp.*, 644 F.3d 1321, 1326 n.17 (11th Cir. 2011) (noting in Title VII racial discrimination case that "[i]n order to be considered 'similarly situated,' the compared employees must have been 'involved in or accused of the same or similar conduct,' yet 'disciplined in different ways' for that conduct.") (citing *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)); *Swackhammer v. Sprint/United Mgmt. Co*., 493 F.3d 1160, 1167–68 (10th Cir. 2007) ("Another common method [for proving pretext] is a differential treatment argument, in which the plaintiff demonstrates that the employer 'treated [the plaintiff] differently from other similarly-situated employees who violated work rules of comparable seriousness' in order to show that the employer failed to follow typical company practice in its treatment of the plaintiff.") (quoting *Kendrick*, 220 F.3d at 1230).

[161] Doc. 46 at 92 (citing *Swackhammer*, 493 F.3d at 1168).

In arguing that Defendant's failure to investigate his complaint of discrimination is evidence of pretext, Plaintiff relies on *E.E.O.C. v. C.R. England, Inc.*,[162] in which the Tenth Circuit noted that "[i[t is true that a failure to follow company policy can support a finding of pretext in some circumstances."[163]  However, the Tenth Circuit discerned no basis in that case "for concluding that an otherwise reasonable justification by an employer should be deemed pretextual merely because it is not directly reinforced by an official rule or policy."[164]  Although Defendant's policy does call for the prompt investigation of complaints of discrimination, including in the hiring process, it does not require Defendant to continue considering an applicant who communicates or otherwise behaves in a manner that Defendant believes would make him a poor fit for a school environment.[165]  Moreover, only nine days passed between Plaintiff's email complaint of discrimination and Defendant's decision to cease considering him for employment and, during that time, Plaintiff and Defendant continued to communicate and scheduled a meeting to discuss Plaintiff's concerns.  Plaintiff ultimately cancelled that meeting without explanation.  Plaintiff has simply failed to produce evidence of "serious procedural irregularities"[166] sufficient to show that Defendant's non-discriminatory explanations "are 'so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude [they are] unworthy of belief.'"[167]  Defendant is therefore entitled to summary judgment.

---

[162] 644 F.3d 1028 (10th Cir. 2011).

[163] *Id*. at 1045 (emphasis omitted).

[164] *Id*.

[165] *See Randle v. City of Aurora*, 69 F.3d 441, 454 (10th Cir. 1995) ("The mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent or that the substantive reasons given by the employer for its employment decision were pretextual.") (emphasis omitted) (citation omitted).

[166] Doc. 46 at 92 (citing *Mohammed v. Callaway*, 698 F.2d 395, 401 (10th Cir. 1983)).

[167] *C.R. England, Inc*., 644 F.3d at 1038–39 (quoting *Johnson v. Weld Cty., Colo*., 594 F.3d 1202, 1211 (10th Cir. 2010)) (alteration in original) (other citations omitted).

## V.    Conclusion

Defendant is a school district, and its primary function must therefore be to provide for the safe and effective education of children.  In fulfilling that function, Defendant must not only choose the candidates it deems most qualified in terms of skills, education, and experience, but must also select candidates it deems fit to interact with children, parents, other educators, and school staff.  Plaintiff has not presented evidence sufficient to discredit Defendant's assertion that it hired other candidates for certain positions due to their better qualifications or for another legitimate business purpose, and that it ultimately declined to hire Plaintiff for any position due to its belief that he did not possess the appropriate temperament for working in a school setting. In the absence of such evidence, it is not this Court's prerogative to second-guess Defendant's judgment.  "Federal courts do not have a 'roving commission to review business judgments,' and may not 'sit as super personnel departments, assessing the merits—or even the rationality—of employers' non-discriminatory business decisions.'"[168]  Because Plaintiff has not presented evidence sufficient to create a genuine issue of material fact as to whether Defendant's proffered legitimate, non-discriminatory reasons for not hiring him were pretext for disability discrimination, the Court grants summary judgment in Defendant's favor on Plaintiff's claims.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion for Summary Judgment (Doc. 43) is **granted**.  Plaintiff's Motion to Strike the Affidavits of Susan Westfahl, Leala Taylor, Phyllis Olbert and Jewell Ragsdale, Which Were Submitted in

---

[168] *Greene v. Brentwood Union Free Sch. Dist.*, 966 F. Supp. 2d 131, 156 (E.D.N.Y. 2013) (quoting *Mont. v. First Fed. Sav. & Loan Assoc. of Rochester*, 869 F.2d 100, 106 (2d Cir. 1989); *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991)); *see also Babbar v. Ebadi*, No. 99-3040, 2000 WL 702428, at *6 (10th Cir. May 26, 2000) ("We have previously recognized that when analyzing the pretext issue, [we] do not sit as 'super-personnel departments' free to second-guess the business judgment of an employer.") (quoting *Bullington v. United Airlines*, 186 F.3d 1301, 1318 (10th Cir. 1999), *implicitly overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) (alteration in original)).

Connection with Defendant's Motion for Summary Judgment (Doc. 47) is **granted** as to the affidavits of Ms. Taylor, Ms. Olbert, and Ms. Ragsdale, and **found as moot** with respect to the affidavit of Ms. Westfahl.  Defendant is granted leave to substitute the affidavit of Dr. Kelli Mather for that of Ms. Westfahl.

**IT IS SO ORDERED.**


Dated: June 21, 2018

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE